*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re GREYNOLDS, Minors.

UNPUBLISHED
January 27, 2022

No. 356646
Kalamazoo Circuit Court
Family Division
LC No. 2017-000533-NA

Before: GLEICHER, C.J., and BORRELLO and RONAYNE KRAUSE, JJ.

PER CURIAM.

Respondent-father appeals as of right the termination of his parental rights to his minor child, SDG, under MCL 712A.19b(3)(a)(*ii*) (desertion for 91 days without seeking custody); (c)(*i*) (conditions leading to adjudication continue to exist); (c)(*ii*) (failure to rectify other conditions); and (j) (reasonable likelihood the child will be harmed if returned to the parent's care). We affirm.

## I. BACKGROUND

Respondent's involvement in this matter began in April 2018. The minor child, SDG, was one of several children removed from the care of their mother; only SDG was respondent's child. None of the other parents are involved in this appeal. The child, then approximately three and a half years old, was initially removed from the mother's care due to concerns about the mother's use of methamphetamines, the lack of heat and electricity in the mother's home, and two of the other (older and school-aged) children's unexcused absences from school. Regarding respondent and SDG in particular, the petition alleged:

> N. [Respondent] is currently on parole for possession of methamphetamine, breaking and entering a building with intent, and larceny. [Respondent] has extensive criminal history including felonious assault of a pregnant woman, assaulting a police officer, possession of methamphetamine, and larceny.

> O. Due to [respondent's] violent criminal past and his lack of relationship with his minor child, [SDG] will be at a substantial risk of harm if placed in the care and custody of his father.

Respondent contended that the allegations were "exaggerated," but he nevertheless stipulated that there was probable cause to authorize the petition. SDG was placed with respondent and his partner, under the supervision of the Department of Health and Human Services (DHHS) and subject to a home visit by the DHHS. Respondent ended his parole shortly thereafter, but early the next month, he tested positive for methamphetamine while SDG was in his care. Respondent admitted that he made a "one time" decision to "party" after he "got off parole," but he maintained he only used marijuana using a friend's bowl; he speculated that the same bowl had previously been used by the friend for methamphetamine.[1] SDG was removed from respondent's care, and the DHHS filed an amended petition seeking placement of SDG with the DHHS.

The caseworker recommended that respondent participate in drugs screens, undergo psychological and substance abuse assessments, follow doctor's recommendations regarding his various medical issues,[2] and engage in parenting time. The trial court entered an order adopting those recommendations, including ordering respondent to undergo psychological and substance abuse assessments. SDG was placed in foster care, where he largely did well, although he had ongoing emotional regulation and aggression issues. Respondent received parenting time, with which he was initially inconsistent, but with which he improved significantly. He was generally regarded as being largely appropriate with SDG. However, throughout the entirety of the proceedings, respondent missed a vast number of drug screens, failed to engage with the drug screening process despite repeated explanations of how to do so, and almost never tested negative for methamphetamine. Nevertheless, caseworkers regarded respondent as "actively participating in the case" and making "substantial progress," while SDG also made significant improvements while in foster care and in his therapy.

Unfortunately, as the case progressed, respondent began to backslide. He tested positive for methamphetamine or missed drug screens, and he began to become "inconsistent" with attending parenting time visits. SDG began showing "increased behavior problems" that were eventually traced to the inconsistency in respondent's involvement with parenting time visits. Respondent also repeatedly failed to engage in parenting classes or in therapy. Respondent also missed several hearings, variously due to health issues or because he was arrested or otherwise dealing with criminal matters involving his possession of methamphetamine. When SDG was approximately four and a half years old, the trial court suspended respondent's parenting time, expressing hope that doing so would be a "cold glass of water" that would induce respondent, along with the other involved parents, to take the needs of the children more seriously and demonstrate greater involvement.

---

[1] This drug screen was voluntary. Respondent would, at the end of this case, later contend that the only reason he agreed to this screen was because the first caseworker told respondent that nothing would happen even if he tested positive for drugs. Respondent contends that, because SDG was then removed from his care because he tested positive, this lie hopelessly poisoned any possible trust or working relationship he could otherwise have hoped to have with the DHHS.

[2] Although not discussed on the record at that time, it was later revealed that respondent had diabetes, which he seemingly did not manage effectively, and that he had suffered strokes.

Respondent continued to either miss drug screens or test positive for methamphetamine. Meanwhile, SDG showed dramatic improvement in his behavior and sleeping habits after the suspension of parenting-time visits. A trauma assessment for SDG opined that "unless dramatic parental change occurred" in short order, SDG's interests would best be served by termination of his parents' parental rights. The goal of the proceedings was changed to adoption.

Respondent finally underwent a full psychological and neuropsychological evaluation. The results of that evaluation were not optimistic. During the evaluation, respondent admitted to using methamphetamine as recently as the previous month. The evaluation recommended outpatient substance abuse treatment and cognitive behavioral therapy as well as parenting classes. In more detail, the psychological evaluation indicated that respondent had a "significant elevation" on the child abuse potential inventory, suggesting that he was an individual "with low frustration tolerance, tendencies to be impulsive, and prone to increasing levels of coercive discipline as stress increases." He also scored highly on a rigidity scale, suggesting that he was an "individual with rigid and unrealistic expectations in terms of behavior of a child or appearance of his home." Respondent's test results showed a "High Probability of having a substance use disorder." Respondent also reported a long history of incarcerations as well as medical problems, including diabetes and heart problems, and he showed neurocognitive deficits. The evaluation included three recommendations: (1) "strictly supervised and structured" parenting time contingent on negative drug screens; (2) services, including outpatient substance abuse treatment and therapy; and (3) following a "pattern of compliance" for 6 to 9 months, specific training in areas of abuse and neglect as well as a reevaluation of respondent for purposes of considering reunification. However, according to the evaluation, respondent's problems were "long-term in nature" and his prognosis was "poor."

Respondent enrolled in parenting classes, but he only attended one session and left early, stating that he did not like the class and felt that it was not appropriate for him. He continued to miss most of his drug screens and test positive for methamphetamine when he attended. Respondent was hospitalized for a time. He nevertheless maintained that he wished to see SDG. The case worker characterized respondent's progress as "minimal." The trial court held a termination hearing over four days total, spread out over the course of more than a year, in large part due to delays resulting from the COVID-19 crisis. The testimony generally recounted how respondent had made significant progress at the beginning of the case, only to decline as the matter went on. Respondent had repeatedly been informed that, to resume parenting time visits, he needed to maintain consistency in mental health services, substance abuse counseling, clean drug screens, and parenting classes. Respondent nevertheless failed to show that he could achieve any of the above. Respondent enrolled in inpatient drug treatment, but repeatedly postponed attendance for various reasons before finally completing inpatient treatment in December 2020. By the time of the final hearing, respondent had begun attending therapy and a parenting class.

In a written opinion, the trial court terminated respondent's parental rights as described above. This appeal followed.

## II. STANDARDS OF REVIEW

"A court may terminate a respondent's parental rights if one or more of the statutory grounds for termination listed in MCL 712A.19b(3) have been proven by clear and convincing

evidence." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). On appeal, we review for clear error the trial court's decision that statutory grounds for termination have been proven by clear and convincing evidence. *Id*. "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. at 41 (quotation marks, citation, and brackets omitted). We defer to the trial court's "special opportunity to judge the credibility of the witnesses." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009).

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App at 40.

> The trial court should weigh all the evidence available to determine the children's best interests. To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider . . . the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citation omitted).]

The focus of the best-interest analysis is the child, not the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *Id*. at 90. On appeal, we review the trial court's best-interest determination for clear error. *In re Olive/Metts Minors*, 297 Mich App at 40.

The DHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). See also MCL 712A.19a(2). Part of the reasonable-efforts obligation involves the DHHS creating "a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86. Although the DHHS must "expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). To the extent respondent argues that reasonable efforts were not made, his arguments are mostly unpreserved and are therefore reviewed for clear error affecting substantial rights. See *In re Smith-Taylor*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 356585); slip op at 5. To the extent respondent challenges the suspension of his parenting time, this issue is preserved and reviewed for an abuse of discretion. See *In re Laster*, 303 Mich App 485, 490; 845 NW2d 540 (2013).

## III. STATUTORY GROUNDS

On appeal, respondent argues that the trial court clearly erred by finding statutory grounds for termination of his parental rights under MCL 712A.19b(3)(a)(*ii*), (c)(*i*), (c)(*ii*), and (j).

Specifically, respondent contends that there is no evidence of desertion for purposes of MCL 712A.19b(3)(a)(*ii*). We agree. Respondent offers no concrete argument specifically regarding the other statutory subsections but rather maintains that termination was improper when he had shown progress in addressing barriers to reunification, and he argues that he should have been afforded more time, particularly in light of COVID-19, to work toward reunification before his rights were terminated. We disagree.

## A. MCL 712A.19B(3)(a)(*ii*)

We agree with respondent that the trial court clearly erred by terminating respondent's parental rights under MCL 712A.19b(3)(a)(*ii*). However, this error is harmless because only one statutory ground must be established to support termination. *In re Powers Minors*, 244 Mich App 111, 118; 624 NW2d 472 (2000). We therefore only briefly note that termination of parental rights for desertion is only warranted where there is a total failure by the parent to put forth any efforts. See *In re Mayfield*, 198 Mich App 226, 230, 235; 497 NW2d 578 (1993); *In re Laster*, 303 Mich App at 492. Irrespective of whether his efforts were adequate, respondent clearly did not entirely fail to make them. Furthermore, "desertion is an intentional or willful act," and it cannot be established on the basis of a parent's involuntary failure to see a child, particularly if purposeful state action has been taken to virtually assure a ground for termination and termination is then sought on this basis. See *In re B & J*, 279 Mich App 12, 19-20, 19 n 3; 756 NW2d 234 (2008). Although the trial court faulted respondent for the continued suspension of his parenting time—correctly noting that respondent could have had his parenting time reinstated but he failed to successfully complete the steps needed to do so—the record nevertheless does not show a *complete* failure to participate in hearings or services by respondent.

## B. MCL 712A.19B(3)(c)(*i*) AND (c)(*ii*)

Regarding MCL 712A.19b(3)(c)(*i*) and (c)(*ii*), these provisions allow for termination of parental rights when:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Grounds for termination under these provisions exist when the conditions in question continue to exist "despite time to make changes and the opportunity to take advantage of a variety of services[.]" *In re White*, 303 Mich App at 710 (quotation marks and citation omitted).

As discussed, SDG was removed from respondent's care as a result of respondent's substance abuse problems and criminality. Despite being offered services, and despite extensive efforts to explain to respondent the seriousness of the situation and how to engage in services, respondent made it clear that he could not or would not rectify his drug abuse and criminality. Notwithstanding his initial progress, respondent missed the vast majority of drug screens offered, and when he intermittently submitted to drug screens, those tests were positive for methamphetamine and other substances, and he was arrested during the case for possession of methamphetamine. Respondent's parenting time was suspended following the presentation of evidence regarding SDG's behavioral problems and evidence of how respondent's failure to consistently attend parenting time was negatively impacting SDG. Yet, respondent still failed to appreciate the effect of his drug use on his parenting and on his child, and he failed to take the steps necessary—including regular drug screening and participation in services—to address these issues and resume parenting time. See generally *In re Rood*, 483 Mich 73, 113-114; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.) (noting that failure to visit a child constituted evidence of neglect). Respondent mostly failed to participate in counseling services, failed to attend intake sessions for a parenting coach, failed to complete parenting classes, and insisted that he did not need parenting classes. Caseworkers also struggled to reach respondent directly when trying to communicate with him. He failed to attend meetings relating to SDG's individual education plan, and at times, he was not available when needed to sign consent forms for SDG to receive medical or other treatment.

At most, late in the case, when the termination petition had already been pending for several months, respondent finally began to participate in counseling and he completed an inpatient treatment program in December 2020. However, although these efforts are commendable, when the case is considered as a whole, this late effort does not demonstrate any meaningful change in the conditions that led to the adjudication or to other conditions identified during the proceedings. See *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). Indeed, even after completing inpatient treatment and beginning counseling, respondent continued to miss drug screens and to test positive for methamphetamine as recently as February 2021. He never completed parenting classes, and he failed to show the type of consistent participation needed to reinstate his parenting time. Respondent's failure to participate in, and benefit from, the numerous services available to him supports termination. See *In re Frey*, 297 Mich App at 248.

Overall, on this record, the trial court did not err by concluding that the conditions that brought the child into foster care, and other conditions identified during the proceedings, continued to exist despite time for respondent to make changes and participate in services. See *In re White*, 303 Mich App at 710. Further, given respondent's lack of meaningful progress, the longstanding nature of his substance abuse problem, and the length of time the case was pending, there is no reasonable likelihood that the conditions will be rectified in a reasonable time considering SDG's age. See *In re Williams*, 286 Mich App at 272. Accordingly, the trial court did not err by finding grounds for termination under MCL 712A.19b(3)(c)(*i*) and (*ii*).

## C. MCL 712A.19b(3)(j)

Similarly, with regard to MCL 712A.19b(3)(j), the same facts supporting termination under MCL 712A.19b(3)(c)(*i*) and (*ii*) support termination under this subsection. That is, "a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child

will be harmed if returned to the parent's home." *In re White*, 303 Mich App at 711. As discussed, this case overwhelmingly showed respondent's failure to participate in, and benefit, from his case service plan, despite numerous opportunities. See *In re Frey*, 297 Mich App at 248. Moreover, SDG had exceptional emotional issues resulting in a particular need for consistency, which respondent demonstrated an inability or an unwillingness to provide despite knowing of that need. That failure supports a finding that there is a reasonable likelihood, based on respondent's conduct or capacity, that SDG will be harmed if returned to respondent's care. See *In re LaFrance Minors*, 306 Mich App 713, 729-730; 858 NW2d 143 (2014). The trial court did not clearly err by concluding that termination was also warranted under MCL 712A.19b(3)(j).

Respondent argues that his lack of progress or participation in services should be excused because the COVID-19 crisis occurred during the pendency of the proceedings and disrupted the availability of services. Had the COVID-19 crisis begun earlier in the proceedings, this argument might have had some merit, but the pandemic-related disruptions did not occur until after the first termination hearing had already occurred. This argument might also have had some merit if respondent displayed a greater inclination to participate in services before the termination hearing began. Furthermore, although the crisis disrupted services after March 2020, many services were resumed in some form a few months later. For example, drug screening resumed in June 2020, following which respondent engaged in the same pattern of behavior he had displayed throughout the case: he missed the overwhelming majority of screens and tested positive for methamphetamine when he underwent testing. Some telehealth services were offered to respondent, and respondent could have restarted mental health and substance abuse counseling services. Respondent did not engage in those services. Ironically, the delays caused by the COVID-19 crisis actually gave respondent *more* time to demonstrate the kind of progress that would have been necessary to avoid termination.

Respondent's COVID-19 argument would be more compelling if he had engaged in everything—or even many of the services—offered to him during COVID-19, but he did not. And ultimately, it was not COVID-19 that prevented respondent from participating in services or working toward reunification; instead, this is a case in which—for nearly the entirety of proceedings—respondent chose not to avail himself of the many opportunities offered to him. See *In re Frey*, 297 Mich App at 248.

In sum, the trial court did not clearly err by finding grounds for termination under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (j). In contrast, the trial court clearly erred by finding desertion supported termination under MCL 712A.19b(3)(a)(*ii*). However, because only one ground for termination must be established, any error in the trial court's reliance on MCL 712A.19b(3)(a)(*ii*) is harmless.

IV. REASONABLE EFFORTS AND PARENTING TIME

Aside from his argument that he should have been afforded additional time to participate in services in light of COVID-19, respondent also more generally asserts that the DHHS failed to make reasonable efforts toward reunification. In making this argument, respondent also asserts that there was no basis for suspending his parenting time with SDG. We disagree.

The DHHS developed a service plan for respondent aimed at addressing problems with substance abuse, mental health concerns, and parenting. As discussed, the services offered to respondent under the plan included drug screens, inpatient substance abuse treatment, a psychological and neuropsychological evaluation, substance abuse and mental health counseling, a parenting coach, and parenting classes. Initially, the case service plan also provided respondent with parenting time, until the trial court suspended parenting time in May 2019. As discussed, respondent largely failed to participate in these services. He missed the majority of drug screens, no-showed for appointments, failed to appear for intake sessions, and failed to complete parenting classes. He was also dismissed from counseling for lack of attendance. Indeed, he showed no meaningful progress in addressing the barriers to reunification, and he continued to test positive for methamphetamine, throughout the case and even after completing inpatient treatment. This is, in short, a case in which numerous services were offered, but respondent failed in his commensurate responsibility to participate in, and benefit from, those services. See *In re Frey*, 297 Mich App at 248.

Despite his lack of participation in, or benefit from, the services offered to him, respondent now challenges the reasonableness of the DHHS's efforts on four grounds.

First, respondent contends that the first caseworker involved in the case—Falcon Shepeck—lied to respondent that nothing would happen if he tested positive on a voluntary drug screen. Respondent contends that when SDG was instead removed from his care, this purported deceit amounted to bad faith and created an "insurmountably high level of distrust" that undermined the reasonableness of the DHHS's efforts. Presuming this is even true,[3] respondent never brought this concern to the trial court's attention until the very end of the case, *years* after Shepeck ceased to be involved. By the time of the dispositional hearing in July 2018, a new caseworker had been assigned. Even if respondent and Shepeck had a poor working relationship, and even if Shepeck acted in bad faith, the record clearly discloses that respondent was provided ample opportunities by the DHHS to participate in services, but he failed to do so. In any event, given respondent's essentially consistent involvement in methamphetamines throughout the case, it is inconceivable that respondent would not, sooner or later, have been validly ordered to undergo a drug screen. The evidence further shows that respondent had numerous difficulties unrelated to any trust he might have lacked in a long-departed former caseworker. We are unpersuaded that any deceit by Shepeck meaningfully affected the reasonableness of the DHHS's efforts.

Secondly, respondent contends that the DHHS unreasonably delayed in providing respondent referrals for psychological and neuropsychological evaluations. However, respondent was referred for a psychological evaluation early in the case, and he was scheduled for an

---

[3] Respondent claims that another caseworker, Ali Schwoebel, offered testimony confirming that there had been deception by Shepeck. However, Schwoebel merely relayed that *respondent* told her that Shepeck told him that there would be no repercussions for a positive test and that respondent was frustrated that this was not true. Schwoebel did not express any personal knowledge of the conversation between Shepeck and respondent or whether Shepeck lied to him. We note that respondent's testimony, even if uncontroverted on this point, need not be believed. See *Estate of Taylor v Univ Physician Group*, 329 Mich App 268, 285; 941 NW2d 672 (2019).

evaluation in October 2018. Although respondent appeared for the evaluation, when it came time for testing, respondent said that he did not feel well and left. The DHHS cannot be faulted for respondent's decision to leave. As a result of observations during this initial, uncompleted evaluation, the evaluator recommended a neuropsychological evaluation. The testimony reflected that efforts were made to arrange that evaluation; however, at a hearing in March 2019, it was noted that a referral had not been made because respondent had stopped participating in services. Nevertheless, the evaluations were eventually arranged, and respondent underwent full evaluations in July 2019. Recommendations were made at that time by the evaluator, and on the basis of those recommendations, additional services were offered to respondent, but he again failed to avail himself of the services offered. Respondent now claims that the evaluations should have been completed earlier and that the failure to do so was unreasonable. Given respondent's chronic failure to participate in services, even after the evaluations were complete, his argument wholly lacks merit. Quite simply, nothing in the record supports that respondent would have "fared better" had the evaluations been conducted earlier. See *In re Fried*, 266 Mich App 535, 543; 702 NW2d 192 (2005). Accordingly, respondent has not shown plain error.

Thirdly, respondent argues that a caseworker failed to timely provide him with a copy of his case service plan. The caseworker admitted at a review hearing in October 2019 that she had not yet provided respondent with a copy of the parent-agency treatment plan. However, she also stated on the record that she would meet with respondent after the hearing to discuss the plan with him in detail. Therefore, respondent had a copy, at the latest, in October 2019. Nevertheless, even if the delay was improper, it is abundantly clear that respondent knew, throughout the course of the case, that he needed to engage in services to have SDG returned to him. Respondent testified at the termination hearing that he knew he needed to participate in services. The caseworkers also testified that they discussed services with respondent, and the needed services were repeatedly discussed at hearings in this case. For example, respondent was repeatedly given instructions on how to participate in drug screens, but he simply failed to do so. While now apparently contending that he was unaware of what was required, respondent in fact began numerous services—e.g., parenting classes and counseling—but he failed to follow through and complete these services. It is disingenuous for respondent to suggest that he was unaware of his responsibilities on the basis of what is, in effect, a technicality. As discussed, respondent's failure to participate in, and benefit from, services is fully attributable to his own choices. Respondent has not shown plain error.

Finally, to the extent respondent attempts to fault the DHHS for the suspension of his parenting time in May 2019, the DHHS's obligation is to include parenting time in the case service plan, *unless* parenting time has been suspended by the court. See MCL 712A.18f(3)(e). The trial court did suspend the parenting time, meaning that the DHHS cannot be faulted for failing to provide parenting time to respondent thereafter.

Furthermore, the trial court did not abuse its discretion by suspending respondent's parenting time. The basis for suspension was that respondent's inconsistency in attending parenting time was contributing to SDG's behavioral problems. As of May 2019, the record showed that respondent had attended three of eight parenting-time visits since the last hearing, and

he missed all visits between February 29, 2019 and April 24, 2019.[4] SDG had well-documented and significant behavioral issues, at preschool and at home, including physical aggression with peers and adults. SDG received counseling and other services aimed at addressing these behaviors. Significantly, SDG also underwent a trauma assessment. The trauma assessment, and the opinions of SDG's counselor, identified one of the causes of SDG's behavior as a need for consistency. In particular, it was "likely that [SDG's] increasing disregulation [sic] and the behaviors that have escalated over the last few months are directly related to his uncertainty and powerlessness about where he will live and when he will see his parents." Elsewhere, the report indicated that unpredictable contact was "only serving to destabilize and disregulate [sic] [SDG]," triggering and perpetuating the "stress response to which he is already . . . vulnerable," and "reduc[ing] the efficiency of the supports" in place. The caseworker likewise opined that SDG's behavioral problems were attributable to not knowing whether there would be visits or not having expected visits.[5] Given SDG's need for consistency, the caseworker thought that his behavior would stabilize if respondent either provided consistency by attending all visits or if the visits were stopped altogether.

The trial court suspended parenting time, reasoning that stability and consistency were very important foundations for the child and that this consistency was lacking. However, the trial court also stated that it hoped to see a change in circumstances, and the trial court indicated that the suspension could be revisited. Indeed, respondent was repeatedly told that parenting time would be reinstated if he demonstrated consistency in participating in services, but respondent failed to show this consistency. After parenting time was suspended, reports from his school and his foster parents were that SDG's behavior showed improvement. The record therefore shows that the trial court's decision to terminate parenting time was reasonable, and when respondent failed to make any progress or to show any consistent participation in services, the trial court likewise did not abuse its discretion by not reinstating parenting time. See *In re Laster*, 303 Mich App at 490 (recognizing that parenting time decisions during the dispositional phase are "left to the sound discretion of the trial court and [are] to be decided in the best interests of the child").

In sum, respondent has not shown plain error related to the DHHS's reasonable efforts when the record shows that the DHHS offered numerous services toward reunification and that it was respondent who failed to avail himself of these opportunities. Further, the trial court did not abuse its discretion by suspending parenting time in May 2019.

## V. BEST INTERESTS

Finally, respondent argues that the trial court erred by concluding that termination was in SDG's best interests, particularly considering the bond respondent shares with SDG. We disagree.

---

[4] Respondent more consistently attended visits early in the case, but even if the case is considered as a whole, respondent only attended 31 of 63 parenting-time visits.

[5] At the termination hearing, the foster-care mother similarly noted that SDG's behavior had worsened as respondent became inconsistent in attending parenting time visits.

The trial court addressed SDG's best interests as follows:

> The petitioner has established by a preponderance of the evidence that it is in the best interests of [SDG] that the parental rights of his father, [respondent], be terminated. If there is any bond left between this child and his father, it is a trauma bond. [Respondent] is clearly incapable of caring for [SDG]. Instead, he has essentially deferred to the foster care givers to provide food, clothing, housing, and meeting all the child's material needs as well as providing love, affection, and guidance, and meeting all his emotional and psychological needs. This child needs stability, safety, and permanence, all of which he has been receiving and will receive from his foster care placement. Clearly, adoption is in his best interests.

The trial court did not err by concluding that termination of respondent's parental rights was in SDG's best interests. The trial court considered several factors, including the bond between SDG and respondent. Given testimony about respondent's inconsistent parenting time and the negative effect this had on SDG's well-being as described in his trauma assessment, the trial court did not clearly err by characterizing their bond pejoratively as a "trauma bond." Further, given the length of time the case was pending and respondent's lack of meaningful participation and progress, the trial court did not clearly err by concluding that respondent was incapable of caring for SDG and that respondent had essentially left the parenting responsibilities to SDG's foster parents. In comparison, the trial court emphasized SDG's need for stability, safety, and permanence, which his foster parents were willing and able to provide on a permanent basis. Indeed, SDG entered foster care when he was only three years old, and he had spent close to three years in the care of his foster parents. His foster parents showed themselves capable of providing for SDG's needs and working with him to address his behavioral problems, and they were interested in adoption. Considering respondent's demonstrated inability to care for SDG as compared to the stability offered in SDG's foster home and the likelihood of adoption, the trial court did not clearly err by concluding that termination was in SDG's best interests. See *In re White*, 303 Mich App at 713-714.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Stephen L. Borrello
/s/ Amy Ronayne Krause

-11-